All right. We'll move on to the second case of the day, which is 18-2147, Neighbors Rehabilitation Center, LLC v. United States, Department of Health and Human Services. And we'll wait until everyone is situated. Okay? Ready? Okay. Ms. Byerly, good morning. Hello. Good morning. Hello. May it please the Court, my name is Eva Byerly and I represent Neighbors Rehabilitation Center. We're here today to discuss an agency determination that is not supported by the substantial evidence in the record and that does not support a finding of noncompliance against this facility. Now, given that staff observed sexual contact on numerous occasions, isn't the lack of any monitoring or planning evidence that the policy was simply to allow all sexual contact unless the residents themselves actively resisted? Actually, no, Your Honor. There were, if you look in the record, particularly in the testimony of the Director of Nursing, Ms. Charlotte Wyatt, she discussed having had conversation with her staff. Staff had brought this to attention. Staff at one point had separated residents. Staff are trained per their policy. But when they separated, they were told not to. They were told not to separate unless they voiced a complaint and asked to be separated. So I don't think you can rely on that because the staff members were said, no, don't do that. But the staff members were also directed to monitor and to ensure continued consent and to ensure signs of consent for this type of behavior. What steps are in the record to support that the staff did monitor or do anything to ensure that there was consent for the sexual contact here? I would believe that the step that would be included in the record is the fact that these behaviors were observed and they had been reported to the Director of Nursing. But how would observation by staff members of sexual conduct be evidence of consent of the sexual contact? The staff members were trained in looking for signs of abuse. That included watching the residents and their normal behavior. These staff members worked with these residents on a day-to-day basis. They knew the residents. They knew them well. The record is replete with examples of how each of these three residents were combative at times to care, to touch, if it was something that they did not want or were not consenting to in that moment. Look, here's the problem. Regardless of what management may have intended for the facility policy to be for handling sexual conduct, the staff understood it to be that no action should be taken unless there was an expressed physical or verbal objection. That determination is supported by the counseling of the nurse who separated two patients in which she was informed that her actions in doing so were not proper and further supported by the absence of any assessments or documentation of any follow-up monitoring or planning at the time of the observed incidents. And that strongly supports the determination that the policy as understood by the staff was that consent was presumed unless there was active resistance. And we're dealing here with patients with dementia. And absolutely, yes, we are dealing with patients here with dementia. But again, at the same time, these were patients that were well known to the staff who were working with them. These were patients that made their needs and wants known. And you are not dealing with staff who didn't have an understanding of what these residents were. Let's assume that's true. Let's take the one example that's in the record where one of the staff members separated the residents because she was concerned that there wasn't consent for the sexual activity. There's no evidence that anything else was done to monitor that relationship. There's no evidence in the record that they went back and spoke with the resident to make sure that the resident understood what was going on. There's no evidence that they went back to make sure that the resident was capable at that point of consenting. There's no evidence that they went back to monitor the relationship. So I come back to the first question I asked. What in the record supports your argument that your client took steps to ensure that there was consent for the sexual activity? My client took these steps by continuing to train their staff. To do what? To monitor their patients. They were training them not to do anything unless they voiced consent. Unless they voiced objection. How can that be training them to look out for the residents? Because the training is a little bit more nuanced than just looking for the signs of not consent. It's looking for all signs of abuse in general. And again, these staff members, while they might not have documented every single conversation that they had in the record, certainly are conversing with and interacting with these residents on a daily basis. What about the fact that when there was an observation by the staff member, and the staff member separated the two residents, that there is no evidence in the record of any kind of follow-up? How can that support your argument that it was observations and they acted on those observations? And I believe that you're referring to the same instance where that staff member was later disciplined or spoken to about that situation. Because she spoke up and separated them. At that point... That's not comforting. The director of nursing in that situation did follow up on that circumstance. How? What's in the record that she did anything to go back to those residents and see if they were capable of consenting and if they did consent to the sexual contact? I believe, and I don't have the exact page number, but in the record there is an investigation report that was drafted by the director of nursing. Again, I don't have the exact page number and I apologize for that. I could submit that to the court if you would like. But that is evidence that shows that the director of nursing did in fact sit down and look at the situation. And again, there is no requirement that the director of nursing document every single thing that she does. You're talking about one. We're not talking about every single thing. Can you think of any other place in society in which the failure to object would constitute consent? I'm afraid that Neighbors is holding dementia patients to a higher standard than persons in society who, as a whole, essentially presuming consent to all sexual contact, unless a person verbally or physically lashes out against it. Your point is well taken, Your Honor. I understand that. But again, the looking for signs of consent, looking for signs of abuse that has come from training that is not merely created by Neighbors but has come from other organizations that are well respected in this field such as the Alzheimer's Association and the other materials that are used to train staff. I don't think the Alzheimer's Association says that there is a presumption of consent unless a patient with dementia, and let's add on one who can't hear, actually objects and voices no. I don't think the Alzheimer's Association supports that. Again, I go back to, though, Your Honors, that at this point Neighbors does believe that the Department of Human Services did not meet the substantial evidence burden, and that for that reason, the reasons outlined in the brief, that this agency decision should not stand. Has Neighbors been able to carry on? Is it still in existence? It is, yes, Your Honor. Ms. Parley, let me switch to the fine issue. What's the appropriate standard of review for reviewing the fine that was imposed here? You seem to argue both a substantial evidence and an abuse of discretion. What are you arguing the court should review that imposition of fine under? Substantial evidence, Your Honor. And what's your basis for that? My basis for that is that that is the standard of review for an agency decision. Thank you. And at this point, Your Honors, I'd like to reserve the remainder of my time for rebuttal. Of course. Thank you. All right. Good morning, Ms. Sanzulla. Good morning, Your Honor. Can I, yeah, I just want to, right away, that last point, please. Here, the board accepted that Neighbors had $74,122 in cash and net income before taxes of $146,640, but concluded that the penalty of $83,800 was still appropriate. Where the history of noncompliance did not involve allegations that were similar in nature to the ones alleged here, should it be considered excessive to impose a penalty that well exceeds the cash and net income of the facility? Not in this case, no, I don't believe so. That's because there are, the history has to do with ongoing compliance. And part of the purpose of the remedies imposed is to But if they're bankrupt, how can they remain in anything? Well, this facility was not bankrupt, plus the remedy, the CMP in this case, the, it's just a small portion of the stream of money that Medicare pays on an ongoing basis to each facility on a month, I think the payment is monthly. There were, in addition, in this particular case, the ALJ analyzed all of the history, gave them credit despite the fact that the underlying financial statement on which the CFO relied to make his statement, that was, showed that it was not prepared according to generally accepted accounting principles in that the entity whose statement it was, was just one part of a variable interest entity. And that financial statement did not include the assets or liabilities or the financial information pertaining to the other entity in the variable interest entity. In the what? It's, the short of it is called a VIE, Variable Interest Entity. Yeah, okay. Is there a regulation that would govern payment of this amount? Is it something done over time? Is it something you withhold Medicare reimbursements for? Well, I believe that the regulation now provides that the CMP has to be paid up front and that it is reimbursed if it needs, if any sort of appeal is not successful. And that there are a variety, I would imagine, a variety of ways of dealing with it if the facility has an issue with full up-front payment. I would like to proceed. May it please the court. I am Joan Zanzola. This case concerns, as you know, Neighbors Rehabilitation Center's failure to comply with the regulation 42 CFR 483-25H requiring that nursing homes participate. Have you memorized the numbers? I have. I'm fascinated by that. Well, at the time of the regulate, at the time of the survey, it was 483.25H. Oh, no, no, I didn't want to be further confused. Well, they have updated the regulations and it's now at a different site. But at the time it was this particular regulation. I suppose it's impossible for you to tell me what all those things mean, just the number of numbers. Yes, I can, as a matter of fact. The resident, the H-1, requires the resident's environment to remain free of accident hazards. And H-2 requires, Your Honor, that the residents receive adequate supervision and assistance to prevent the accidents. That's one simpler way of putting it. They're required to supervise. I know. Thank you. Thank you. And it's the Secretary's position that substantial evidence supports the Board's determination that neighbors violated this regulation when it allowed three cognitively impaired residents in its locked dementia unit to be groped and fondled by other more cognitively intact residents and by failing to determine the affected resident's consent and capacity to consent to sexual activities. Substantial evidence supports the immediate jeopardy citation for scope and severity. And substantial evidence also supports the Board's decision, which is free of legal error, to affirm the $83,800 CMP. As this Court noted, consistent with the DAB's or the Board's case law, the requirements for adequate supervision in similar cases is identifying the safety hazards and risks, devising and implementing a plan of supervision, monitoring and assessing the effectiveness of the supervision plan on an ongoing basis to reduce known and foreseeable accident risks to the highest practicable degree. The facility is required to take all reasonable steps, and there's a continuum of affirmative duties that must be taken. It's an ongoing basis. Here, neighbors' employees witnessed the incidents but failed to speak with the residents about their feelings and regarding their concerns regarding the relationships. They failed to document the residents' consent capacity, if any. They failed to communicate with the residents' physicians, failed to discuss the incident with the residents' family members or responsible parties, and failed to record any behavior monitoring, and then finally failed to make any care plan to account for them. As this tribunal has noted, the neighbors' policy as implemented relied on only intervening if the victim protested. With respect to Resident 1, the Board emphasized that he was more cognitively intact than the other two residents and determined that neighbors were obligated to investigate and consider what planning was called for. As to Resident 2, the Board considered the facility's own records and the witnesses' testimony and determined the ALJ's conclusions were supported. The Board found that the relevant question was whether the facility actually engaged in assessment of the capacity to consent to sexual interactions, assessed whether he did in fact consent to the interactions with Resident 1, and planned for how the interactions with Resident 3 and any other female resident would be handled to protect their safety and dignity. Neighbors has not identified any assessment or planning regarding Resident 2's sexualized conduct. Is all this in your brief? Pardon me? Is all this in your brief? Yes, sir, it is. Then why are you reading it to us? Well, I just want to be sure the court understands our position. We do understand your position. I will move forward then. As you're moving forward, let me ask you, please, the same question I asked your opponent. What is the appropriate standard for the court to review the CMP with? It is a substantial evidence standard. May I also bring out a few points regarding opposing counsel's assertions with regard to the Director of Nurses, or Don's, conversations with the staff. The ALJ discounted it because it disregarded the direct care staff's impressions regarding the claim nuances in their policy. There was no evidence of the claim nuances. Regarding the investigation that she spoke of, that occurred on February 20th, several weeks after the encounter between Resident 1 and Resident 2. That, too, was discounted because the ALJ, because Resident 1 denied it and Resident 2 couldn't remember. So it was discounted and it was untimely. Regarding its guidelines, neighbors narrowly seized on one particular statement in the Alzheimer's Association guidelines, but then broadly applied it and failed to consider the other requirements that the Alzheimer's Association recommended to prevent sexual coercion. So, yes, substantial evidence does support it. With regard to the immediate jeopardy citation, the ALJ found and the board held, agreed that it goes to the entire state of readiness in the facility at the time in question. And the secretary determined that there was no state of readiness with this policy. It was just simply to stand back and do nothing. And regarding the CMP, the regulation, the ALJ considered it de novo and extensively analyzed it as indicated from the outset. Regarding the noncompliance, the history of noncompliance, its condition, the relationship of one deficiency to the others, and the facility's culpability. And here the ALJ found the facility culpable because of the disregard of its direct care employees and found that there was a rational connection between the decision made and the choices made. In conclusion, we feel substantial evidence supports the board's decision upholding the finding of noncompliance, including its immediate jeopardy determination as being not clearly erroneous, and also supports the board's decision to affirm the reasonableness of the CMP. Neighbors has not shown otherwise, and the court asked, the secretary asked this court to affirm his decision to impose the total CMP of $83,800. Thank you. Thank you. Your Honors, I do want to come up and bring up a point that you guys made that I thought was very pertinent, was that this CMP is excessive. For a facility like Neighbors, this CMP is excessive, particularly in regards to the allegation that it is related to past noncompliance. The situation that was complained of in the prior survey was not at all related to an allegation of abuse or an allegation of inappropriate behavior among the residents or anything of that nature. Does it have to be the same? They are considered under the regulation to be related, because it is an alleged violation of the same citation number. But it is a violation of that same citation number in completely disparate ways. So, again, my client firmly believes that this CMP was excessive. It does not follow with the culpability or with truly the history of noncompliance in this facility. Thank you, Your Honors. Again, we ask that the agency's decision be reversed and the CMP be either removed or reversed. Thank you very much. Thanks to both parties, and the case will be taken under advisement. Thank you. Thank you.